# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>JEAN JANVIER,<br>    Defendant. | )<br>)<br>)<br>)   Crim. Action No. 10cr10029-NG<br>)<br>)<br>) |

GERTNER, D.J.

## MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO SUPPRESS
## July 26, 2011

The Memorandum and Order of July 11, 2011, is hereby amended and replaced by this Memorandum and Order due to formatting and typographical errors. Every other aspect of the Memorandum remains intact.

Jean Janvier ("Janvier") was arrested following an anonymous 911 call about a man with a gun. That call, together with Janvier's behavior when the police arrived at his home, 17 Gleason Street, justified a stop under Terry v. Ohio, 392 U.S. (1968), according to the police. I disagree.

The 911 information and the officer's observations supposedly led him to "run after" Janvier on the steps leading to his apartment, then reach out and touch a gun in Janvier's waistband. The fruits of the stop led to Janvier's arrest for unlawful possession of a firearm, a firearm with altered serial numbers, and unlawful possession of ammunition.

The problem is that the anonymous caller's description of "a man with a gun" did not match Janvier's. The location identified in the call, at least as an initial matter, covered a number of houses on Gleason Street, Dorchester, not merely Janvier's. And when the unmarked but very obvious police car arrived, Janvier, who was standing on the small porch of his own home,

simply turned to go inside.  Nothing about the call should have focused suspicion on him; and nothing about his behavior at the scene justified the Terry stop.

Defendant filed a motion to suppress the fruits of the search.  The government opposed; I held a hearing over two days, with multiple exhibits.  While I greatly appreciate the need to put an end to gun violence in Boston, and I understand that the area in which Janvier's home was located was a "high crime area," there are rules -- constitutional rules -- that define how officials must go about their investigations.  Following the constitution makes for less efficient law enforcement, to be sure, but, in the final analysis, far more legitimate.  Defendant's Motion to Suppress (**document #17**) is **GRANTED.**

**I.    FACTS**

   **A.    The 911 Call**

Exhibit 1 to the December 29, 2010, suppression hearing is the 911 call tape, which the Court has listened to several times.  Some parts are difficult to understand.  What follows is an account of the call, reflecting a consensus account of its contents.

At about 9:00 p.m. on October 25, 2009, the Boston Police Department ("BPD") received a call over its emergency 911 system.  The caller was a woman, who, after being advised that the call was being recorded, was asked for the location of her emergency.  She said it was Gleason Street.  When asked for further details, the caller said it was between "17, 18, 19 and 23." Eventually she reported that the man was "standin' up on 18 Gleason Street."

The caller reported that the man was "harassing" and that he was "trying to find 18 Gleason Street."  She indicated that the man had a gun, that he "had it in his pocket, then he

threw it, then he put it in the back of his pants." When asked which back pocket the gun was in, the caller told the operator that the man had the gun in "his waistband."

The caller described the man as follows: He was black, less than 30 (although she later said "like 26, 27, I'm not sure."). He was wearing black jeans, a white t-shirt, black hoodie sweater, and black sneakers. She described his height as "maybe 5'6", 5"7" and weight, "umm he's like, I don't know about, maybe . . .maybe 210," and that he had "low cut hair."

The caller then complained to the operator about the questions she was being asked. When asked for more details about the man's appearance, the caller hung up.[1] She never gave her name or address. She never expressed a willingness to be called back. While the testimony suggested that some time later -- after Janvier's arrest -- the BPD was able to identify the subscriber of the cell phone from which the call was made, no attempt was made to get in touch with her.

After receiving the report, the 911 operator sent out the message, dispatching police to Gleason Street. Sgt. James Tarantino ("Tarantino") responded from an unmarked gang unit cruiser, which he operated along with Gang Unit Officer Jack Conway ("Conway") and Massachusetts State Trooper Steve Johnson ("Johnson").

The radio operator advised these officers that, "Guys, its black male, black hoodie, white shirt, black jeans, black sneakers, about 210, he has the gun in the back of his waistband." She then added that the man was "about 5'7."

---

[1] Exhibit 10, which was a computerized "incident history" noted that the caller "wouldn't give any more info, clr hung up." Suppression Hr'g Day 1 Tr. 89:24-25 Dec. 29, 2010 (document #26) [hereinafter "Hr'g Day 1 Tr."].

Janvier did not meet the description. The weight, the sneakers, the pants, and the hoodie did not match. He was wearing blue jeans and a dark jacket, but had on a white sweater with a hood worn over a white shirt with a large design in the center. He wore white sneakers, and had on a "big black puffy coat" like a bomber jacket. The height and race of the man was a closer match; Janvier was 5' 8", Haitian, and 24 years old.

But the most significant detail that did not match Janvier was his build: He was considerably slighter than the description by 70 pounds. He weighed 140 pounds – not 210 – which even the officer characterized as a "slim" build. Boston Police Dep't Booking Form and Incident Report, 1 (document #19-3) [hereinafter "Police Report"]. As the officer noted, the details that *did* match could not have been more generic – "dark top, black man in his 20's." Hr'g Day 1 Tr. 64:3-7.

The police saw no one else on Gleason Street but the three men outside of 17, not 18, Gleason Street.

### B.   The Setting

The setting of the stop was significant, so significant that the defense sought to have the Court take a view of the area. When the Court denied that motion, the defendant prepared a video,[2] which I found to be highly probative.

This was a residential area. Number 17 Gleason Street was a two family home with a small porch. Janvier lived there with his parent and sisters. The house was surrounded by a metal fence with a latched gate. There was a street light across the street, but the officer who made the stop could not recall if there was any light on the porch. Two of Janvier's

---

[2] Hr'g Day 1 Tr. 12:6-11, Ex. 7.

acquaintances were standing in the driveway when the police arrived. At the entrance to the house, one short stairway lead downstairs to one apartment; another lead upstairs to Janvier's apartment. The stairway leading to Janvier's apartment had just four steps. A young man like Janvier could get there in seconds from the front door.

### C. High Crime Area

As they responded to the call, Conway and his partners knew that this was an area frequented by members of the Greenwood Street gang. They also knew there had been two firearm incidents in the ten days before.[3] Police Report, 2. Indeed, the data generated by the BPD suggested this was a "high crime area." Hr'g Day 1 Tr. 32:8-18.

The cruiser was a silver Crown Victoria, which, though unmarked, was easily identified as a police vehicle. Moreover, the officers were wearing their badges around their necks and at least Conway was dressed in a black long sleeved t-shirt that said "Boston Police" on the front, and "Gang Unit" on the back.

### D. The Stop

Conway testified that when they arrived at 17 Gleason Street, Janvier was on the porch of his home, talking to his two friends who were in the driveway.[4] The officers did not recognize Janvier; they did recognize one of the individuals in the driveway. When Conway was specifically asked if any of the three men matched the 911 description he was equivocal: "They

---

[3] Exhibit 2B, generated by the Boston Regional Intelligence Center, suggested that the Greenwood Street area in the area of Gleason Street is a "high crime area with respect to firearms." Hr'g Day 1 Tr. 32:8-18 & 33:1-2, Ex. 2B.

[4] One of the men in the driveway was William Garrison, a Greenwood gang member, who in fact weighed 30 pounds more than Janvier. The second individual, Lawrence Reynolds, also was closer to the 911 caller's description in build than was Janvier. Hr'g Day 1 Tr. 71:6-7, 23.

all kind of did with the dark clothing."[5] Hr'g Day 1 Tr. 43:17. Conway spoke to the two in the driveway; "What's up guys?" he said. Hr'g Day 1 Tr. 46:6-7.

Conway ran after Janvier into the house at 17 Gleason Street, because of Janvier's behavior when the police arrived. Janvier, Conway testified, was trying to hide the gun, was looking furtively from "left to right" and was "fleeing" into his home. But Conway's account of Janvier's behavior on the porch shifted during the suppression hearing, differed from his previous reports, and from an earlier hearing.

During direct examination, Conway testified that, even though Janvier was talking to his two friends who were in front of him -- necessarily facing them, with his back to his house -- Janvier's "back was somewhat exposed." Hr'g Day 1 Tr. 43:11-13.[6] Later, he acknowledged that Janvier's back was not visible to him when he arrived. Indeed, given Janvier's position on the porch, he did not have to do anything evasive to keep his back from view when the police arrived. Hr'g Day 1 Tr. 74:21-25.[7] Moreover, Janvier was wearing a "puffy jacket" the very jacket that the government later claimed justified the anonymous caller making a 70-pound mistake in identifying him. That jacket, as the picture of Janvier suggests, fully covered his back, including his waistband. Hr'g Day 1 Tr. 52:22, Ex. 4A.

---

[5] The comment was troubling, to say the least. This is a largely black neighborhood; the caller gave a generic description of a black man that could have described many young men in the the neighborhood.

[6] At an earlier hearing, Conway claimed that when Janvier saw Conway, he turned his back so that it was out of the officer's view. Supervised Release Revocation Hr'g Tr. 12:17-19.

[7] Officer Conway testified that the man on the porch was "blading" which meant "if I'm approaching someone and they're concealing a weapon they turn that part of their body away from me, keeping that part away from my view." Hr'g Day 1 Tr. 26:16-18. As noted above, the testimony made no sense. Janvier was facing his friends with whom he was talking, back against the door. Then he turned, back to the police, opened the door and went inside his apartment.

Conway also reported that Janvier started looking left to right and appeared "nervous," not an unreasonable response, if I credit the testimony, for both the innocent and the guilty when police officers arrive at your doorstep. Conway then "got to the fence and put [his] hands on it" at which point Janvier took another step closer to the doorway, while keeping his back hidden from view. Hr'g Day 1 Tr. 45:8-9, 12. On cross-examination, Conway acknowledged that Janvier actually turned fully to go inside, with his back directly in view. Hr'g Day 1 Tr. 84:7-10. Without any more information, Conway said that he "believed the gentleman on the porch had the firearm," and so he pushed open the gate and ran through. Hr'g Day 1 Tr. 46:14-16. In fact, while Conway may have had a hunch about whether the man on the porch was armed, I find that he did not have reasonable suspicion as the law required.

By the time the gate was completely open, Janvier was five to eight feet from Conway.[8] Janvier "fled" into the house, according to Conway. Conway chased him -- through the fence, up the walkway, up the three steps of the porch. Hr'g Day 1 Tr. 77:16-19, 25.[9] He never yelled "stop." Significantly, when the officer entered the door to 17 Gleason Street, Janvier was right there, essentially at the first step. Conway claimed he could reach out to grab the suspect. Hr'g Day 1 Tr. 101:11-12. And when he did, both fell. Conway reported, "I reached out and touched the back of his lower back" and felt a gun. Hr'g Day 1 Tr. 49:19-20. He yelled to the other officers, "he's got a gun!" Hr'g Day 1 Tr. 50:7-8.

After feeling the gun, Conway tried to grab Janvier, who regained his footing and went towards his apartment. The officer caught him on the landing of Janvier's apartment and tackled

---

[8] On redirect, the officer changed this to "five feet." Hr'g Day 1 Tr. 94:25.

[9] Conway acknowledged the distance was more like "8 to 10" feet because of the path that he was obliged to follow. Hr'g Day 1 Tr. 100:12-14.

him. The force of the contact burst open the Janvier apartment door; both fell to the ground. The two other officers, who were following closely behind Conway, arrested Janvier after a struggle, while Conway secured the gun.

Several parts of the officer's account are troubling. Given the layout of the house, the only way for the officer to have caught up with Janvier on the steps going up to his apartment was if a) Janvier was not fleeing at all -- and therefore not behaving in a way that the officer found to be suspicious, or b) the officer was totally mistaken about the encounter on the steps.[10] If Janvier were not running to evade the officer, he would have remained just inside the doorway of the small common area of the building. If he were fleeing, he would have surely been in his apartment before the officer had arrived. The porch was small, his apartment four steps up a flight of stairs. The officer was at some distance from Janvier when he supposedly took chase. Janvier need only open the door to the building, and in seconds he would be in his apartment, long before his pursuer. The account of the struggle on the stairs, in short, is inconsistent with the physical layout of the building.[11]

Janvier's mother, Marie Janvier, testified that she had earlier made arrangements for her son to have dinner, that he went outside while she put the food on the table, and that she then dozed off for five or ten minutes while waiting for him. At some point, the door to the apartment opened, her son said "Mommy" as he fell to the floor. Hr'g Day 1 Tr. 111:11-13. According to her, the three officers then "hit him and beat him." Hr'g Day 1 Tr. 111:20-22.

---

[10] Q: [by defense counsel]: "This entire time that you opened the fence, ran up the stairs of the porch onto the porch, this man has only moved from the doorway to not even getting to the first step; is that your testimony?" Hr'g Day 1 Tr. 80:22-25; A. "Yes, sir." Hr'g Day 1 Tr. 81:1

[11] Defendant claims it would not be so easy to feel a firearm through a heavy coat during the brief encounter on the stairs. I do not have to resolve the issue. I believe the officer had no right to reach out to touch him at all.

## II.   DISCUSSION

Even a temporary police detention constitutes a seizure under the Fourth Amendment. As such, in order to pass constitutional muster that detention must be reasonable by constitutional standards. Terry v. Ohio, 392 U.S. 1, 19 (1968). A police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop. Terry, 392 U.S. at 21. Moreover, actions undertaken pursuant to that stop must be reasonably related in scope to the stop itself "unless the police have a basis for expanding their investigation." United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006). There is no question that when Conway touched Janvier on the steps of 17 Gleason Street, it was a Terry stop.

Reasonableness has to be judged according to objective criteria, not the individual officer's subjective perceptions or motives. See Terry, 392 U.S. at 21-22; see also Whren v. United States, 517 U.S. 806, 813 (1996). And it is a fact-sensitive inquiry, based on the totality of the surrounding circumstances. See United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).

### A.   The Anonymous Call

At the time that the police arrived at 17 Gleason Street, I find that they had no reasonable suspicion to believe that Janvier, the man on the porch, was the man with the gun mentioned in the 911 tape. Indeed, the police agreed that *none* of the individuals at the house -- the two in the driveway, Janvier on the porch -- totally fit the description. They all "kind of fit it," an observation so generic as to be less than helpful. Moreover, of the three, Janvier, the lightest in weight, least matched the 210-pound description in the call. While the government argues that the caller could have mistaken Janvier's baggy clothes for the torso of a heavier man, the

argument is contrived. If reasonable suspicion is to mean anything, it has to mean that a seventy pound differential is not irrelevant.

The fact that the call came from an anonymous source suggests that it may be entitled to less weight, depending on the circumstances. In <u>Florida v. J.L.</u>, 529 U.S. 266, 274 (2000), the Court held that truly anonymous tips must be corroborated in some meaningful way in order to justify crossing the reasonable suspicion threshold. The rationale was straightforward: Where the caller intentionally conceals her identity from police in order to prevent them from "h[olding] her responsible if her allegations turn[ed] out to be fabricated," it undermines the reliability of the tip. <u>J.L.</u>, 529 U.S. at 270.

The test is obviously contextual. Not every anonymous call should be discounted; not every call credited. The First Circuit, for example, applying <u>J.L.</u>, expanded on what that corroboration might entail. In <u>United States v. Ruidiaz</u>, 529 F.3d 25, 30-31 (1st. Cir. 2008), the court held that when determining whether to afford any weight to an anonymous 911 call, the proper test "does not hinge on the definition of 'anonymous'" but rather, on whether the call possessed other indicia of reliability, a determination that must be made "in light of all the circumstances." Significantly in <u>Ruidiaz</u>, the caller confirmed his telephone number and agreed that the police could call him back. 529 F.3d at 30-31. He made it clear that he was willing to be accountable for the information he gave.

Also significant, the anonymous 911 call in <u>Rudiaz</u> did not provide the basis for the initial stop, but rather was part of the information justifying a subsequent protective search of the defendant once he had been lawfully stopped, a distinction which the First Circuit took pains to underscore. <u>Ruidiaz</u>, 529 F.3d at 31. <u>J.L.</u>, in contrast, involved an anonymous tip that the police

used to justify the first prong of the Terry analysis, whether there was a reasonable suspicion to justify the initial stop. Ruidiaz, 529 F.3d at 31 n.1 (citing J.L., 529 U.S. at 274).[12] The distinction between the initial stop and a subsequent protective sweep makes sense. The critical intrusion, the one that most implicates constitutional rights because it can justify further searches, is the first one -- stopping the defendant. In the former situation, courts should look at anonymous 911 calls with care.

In United States v. Andrade, 551 F.3d 103, 110 (1st. Cir. 2008), the Court found that the tip was sufficiently reliable, because the caller was prepared to be accountable for the information and the details were corroborated by police observations on the street. The caller was not only told the call was being recorded, but he confirmed his address, even though he did not give his name.[13] And his address suggested that he was in the very building where the shots had been fired.

---

[12] In Ruidiaz, as a result of the 911 call, which indicated that shots had been fired on a certain street in Brockton, the police went to the location, found a car meeting the description of the 911 call, with a door open and the defendant slumped in it. Thinking the defendant was the victim and not the perpetrator, the officers reasonably reached into the vehicle and touched the defendant's shoulders. The defendant's response suggested that it was the shooter the officers had encountered. The defendant's reaction, coupled with the information from the call provided the basis for a protective search of the defendant, which disclosed a loaded handgun. Ruidiaz, 529 F.3d at 27-28.

[13] As the Andrade court recounted the tip:

> . . . a 911 caller reported a shooting threat to a New Bedford, Massachusetts police operator. After being told by the operator that he was on a recorded line, the caller reported that "[t]hree guys [are] looking to start with some other guy outside on the street here" and confirmed that he was calling from 37 Madison Street. The caller further stated that each of the three men were wearing a hooded sweatshirt-one white, one gray, and one black. The caller told the operator that one of the three men threatened the man who lived in the third floor of 37 Madison Street, telling him that "I'll come back and shoot you or kill you or whatever." In addition, the caller stated that the three men were "walking south on [what] looks like Pleasant Street." The operator, who had a caller ID display showing the name and address associated with the calling telephone number, took notes of the caller's statements.

551 F. 3d at 106.

Likewise in United States v. Bates, 750 F. Supp. 2d 342, 348 (D. Mass. 2010) circumstances corroborated the reliability of the anonymous 911 call. The information contained in the call was extraordinarily detailed. She indicated that her mother had called her, telling her that her niece would be coming over with the niece's boyfriend, and that her mother believed the boyfriend had a gun in his backpack. After consulting her mother, the caller described the man with precision and gave his name. She also provided precise information about his location. Indeed, she identified where he was, the direction he was traveling, while she was on the phone with the police. While the operator never asked the caller's name, she told the operator her location and the basis for her information -- that she was the "aunt of the man's girlfriend." Bates, 750 F. Supp. 2d at 344.

There was nothing similar to either Bates or Andrade in the case at bar. There was no attempt -- during the call -- to confirm the caller's identity, to get her permission to call back. Unlike the callers in Bates or Andrade, the caller here gave limited to no information about who she was or her vantage point. While she knew that she was being recorded, she was hardly cooperative. Indeed, at a critical time -- when the police were seeking further details of the tip -- she expressed annoyance and hung up.

Bates cannot be used for the proposition that, as a general matter, 911 cell phone tips are not truly anonymous because cell phone callers should understand that their identity can be traced. To be sure, the court in Bates noted: "[g]iven current cell phone and caller ID technology, it is likely, even, that the caller knew that her number from a cell phone could be traced easily by police." 750 F. Supp. 2d at 348. But the constitutional question should not be resolved by intoning what the caller *should have* known. Not every cell phone call transforms

the 911 tip into one that should be credited.  Whether the circumstances corroborate the reliability of the call and whether the caller is willing to be accountable for her information are part of the calculus the Court must use to assess reliability.

Nor can <u>Bates</u> be taken for the proposition that there is a different standard for the reliability of 911 calls where "public safety" may be at risk.  Again, the court in <u>Bates</u> cited to the part of <u>Ruidiaz</u>, discussed above, which distinguished between anonymous 911 calls providing a basis for a protective sweep and those that justified an initial stop; public safety figures more prominently in the former than the latter.  529 F.3d at 31 n.2.  In any case, in <u>J.L.</u>, the Supreme Court was completely unwilling to put all gun stops into the "public safety" category.  It expressly noted that it was rejecting all attempts to modify the <u>Terry</u> analysis to create a "firearm exception," under which any tip alleging an illegal gun would justify a stop and frisk even if the accusation failed standard pre-search reliability testing.  <u>J.L</u>, 529 U.S. at 272.  The Court added that it would not speculate about the circumstances under which the danger alleged in an anonymous tip might be so great – e.g., a report of a person carrying a bomb – as to justify a search even without a showing of reliability."  <u>Id.</u> at 273-74.

In the case at bar, the anonymous caller did not provide reasonable suspicion to stop Janvier as of the time that the police arrived at his home.  Nor did Janvier's behavior, turning and taking a few steps to go into his own home, change that analysis.

**B.     The "Flight"**

The government justifies the officers' conduct in following the defendant into his home.  The premise of this is that at the moment the officers arrived, Janvier began behaving suspiciously, both trying to cover up the gun in his back waistband, turning left and right, and

then fleeing into the house. Conway followed Janvier into the home, encountered him on the stairs when he stumbled, reached out and felt a gun in his waistband. I do not accept the government's characterization of Janvier's behavior at all.

I do not credit the officer's account – with respect to Janvier's allegedly evasive behavior on the porch or even the claim that Janvier "fled" into his own home. Janvier was wearing a large puffy jacket. This was the jacket that the government claims led to a 70-pound "mistake" on the part of the anonymous caller. It did not take evasive tactics to cover anything up. In addition, the officer's testimony was inconsistent about what Janvier was or was not doing. It changed during the hearing; it differed from what he had said at an earlier hearing and in earlier reports.

And the flight that the officer described is inconsistent with the layout of the house at 17 Gleason Street. When Conway arrived at the front of the house he was some distance from Janvier on the porch. He describes Janvier as immediately "fleeing" the minute Conway opened the fenced gate. To get to Janvier, Conway had to open the fence, go up the driveway and enter the front door, a distance of perhaps eight to ten feet because of the path he had to follow. Yet when Conway got to the door of the house and went in, Janvier was right there.

The video suggested that it would have only taken a few steps for Janvier to get to his apartment. For Janvier to be where Conway reported he was suggests either that he was not fleeing at all, or the officer is wholly mistaken about the encounter on the steps.

Indeed, there is something particularly troubling about the government's argument. Retreating into one's home, as a matter of law, even if intended to avoid contact with the police, cannot per se give rise to suspicion of guilt. See <u>Silverman v. U.S.</u>, 365 U.S. 505, 511 (1961)

("At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("avoidance of the police, standing alone, does not give rise to a particularized, reasonable suspicion that a person is committing a crime"); Florida v. Royer, 460 U.S. 491, 498 (1983) (plurality opinion) (when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business).

## III.    TERRY STOP

Reaching out to grab a suspect is surely a stop.  See United States v. Mendenhall, 446 U.S. 544, 553 (1980); United States v. Smith, 423 F.3d 25, 28 (1st. Cir. 2005); United States v. Zapata, 18 F.3d 971, 976 (1st. Cir. 1994); United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (a person can be seized through a show of authority only if he yields to that authority; if the person flees, he is seized only when he is caught; defendant was only seized when tackled). In California v. Hodari D., 499 U.S. 621, 628 (1991), the Court held that a reasonable belief that a person is not free to leave is "a necessary but not sufficient condition for seizure."  To be sure, when a person ism as here, physically touched by the police who are running after him there is no doubt; it is a seizure.  Hodari D., 499 U.S. at 625 (internal citation omitted) ("merely touching, however slightly" sufficient to constitute a Fourth Amendment intrusion) (citing to Terry, 392 U.S. at 19 n.16) (a seizure occurs "when the officer, by means of physical force or show of authority, has in some way, restrained the liberty of a citizen").

If there was insufficient suspicion to justify stopping Janvier at the moment the officers arrived, if Janvier's behavior in turning and going into his own home was not suspicious, then

there was neither a basis for pursuit, nor surely, for a <u>Terry</u> stop.  The stop was illegal; its fruits must be suppressed.

## IV.     CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress (**document #17**) is **GRANTED**.

**SO ORDERED.**

**Date:   July 26, 2011**                    /s/ Nancy Gertner
                                                       **NANCY GERTNER, U.S.D.J.**